## McPHERSON vs. THE STATE.

1. NEW TRIAL: *On the ground of surprise.*

An application for a new trial, on the ground of surprise, must show by whom the facts the party expected to prove can be established; that they are material, and must be accompanied by the affidavits of the witnesses, when they and the facts were known to the party and he neglected to have them summoned or called.

2. INSTRUCTIONS.

If an instruction, on a trial for murder, contained a fair exposition of the law, it will not be held objectionable because the court used the term "murder" in referring to the killing.

3. EVIDENCE: *When threats inadmissible.*

Threats not shown to have been communicated to the accused are inadmissible in evidence.

4. VERDICT: *When responsive to the indictment.*

An indictment for murder charges all the lower grades of felonious homicide, and a verdict of manslaughter is responsive to it.

5. CRIMINAL LAW: SELF DEFENSE.

In order to justify the taking of life in self defense, the party must employ all means within his power, and consistent with his safety, to avoid the danger and avert the necessity.

6. — *Change of venue.*

Ch. 52, Gould's Dig., providing for a change of venue in criminal causes, was not repealed by the code, and is still in force.

APPEAL from *Washington* Circuit Court.

Hon. E. D. HAM, Circuit Judge.

*J. D. Walker*, for appellant.

*S. P. Hughes*, Attorney General, *contra*.

HARRISON, J.  The appellant was indicted at the March term, 1872, of the circuit court of Benton county for the murder of Ephraim M. Thomason.  The venue was changed, upon his application, to Washington county, in the circuit court of which county, at the September term, 1872, he was tried and found guilty of manslaughter, and his term of imprisonment in the penitentiary fixed by the jury at three years.  He applied for a new trial, and also moved in arrest of judgment; and both motions being overruled, he prayed and obtained an appeal to this court.

The grounds alleged in the motion for a new trial were:

1. That he was surprised by the testimony of John Brown,

McPherson vs. The State.

Lee Thomason and Manning Richardson, witnesses, introduced by him. That the said Brown, previously to the trial, informed him and his counsel that he would testify, that the first he saw of the difficulty between the defendant and the deceased was, they were fighting before the store of the deceased ; that the defendant got loose from the deceased, when the deceased threw and knocked him down with a weight and jumped on and beat him on both sides of the head and face, and that some person then pulled deceased off, when he (Brown) went into Herd's store and saw no more of it; but when called as a witness, he testified that after the defendant got loose from the deceased, he run and fell; that he did not see the deceased knock him down with a weight, and that when deceased was pulled off, the defendant ran ten or fifteen steps and stopped, stooped down and pulled a pistol from his boot leg, rose up and fired at deceased; and also that he saw the defendant, during the fight, twice strike the deceased.

That the said Thomason also, before the trial, informed the defendant and his counsel that he saw the deceased, at the commencement of the difficulty, collar the defendant first, and would so testify ; but when called, he testified that the deceased did not collar the defendant first, but that each, at the same time, collared the other; and also, that the defendant, as he was leaving the door, tried to get his pistol out of his boot leg — a fact not mentioned by him when telling defendant and his counsel what he saw and knew of the difficulty.

And the said Richardson informed them, that he would testify, that a few minutes before the difficulty, he was in the saloon of the defendant, engaged with the defendant and Clem Thomason, the brother of the deceased, taking an invoice of groceries, when the deceased came in angry, and said in an angry manner, that "if he had anything to give away, he would give it; that no man could run over him that way;"

but when called, testified that he had no distinct recollection of such a remark, and only remembered that the deceased said, "if he had anything to give away, he would give it," or words to that effect, and wholly denied the other fact he said he would swear.

The defendant, in his affidavit in support of his motion, says: That relying on these witnesses to prove the facts they said they would, he had not summoned other witnesses by whom he could have proved them. Who those other witnesses were, he does not, however, say, and the omission to name them is alone sufficient to justify the court in refusing a new trial on the ground of surprise. For, if named, it might have been shown that they were present during the trial, and could have been introduced; or their affidavits denying that they could give such testimony might have been obtained by the state and read upon the hearing of the motion.

It is a rule that a new trial will not be granted on the ground of newly discovered evidence, unless the application therefor is accompanied by the affidavit of the persons by whom it is alleged the new facts can be proven, and the rule or the requirement will extend to and apply with equal if not more force to a case like the present, where both the facts and the witnesses, who could prove them, are known to the party, but he has neglected to have the witnesses summoned or called.

But the testimony of these witnesses called and accredited by him was corroborated by a number of other witnesses; yet, if their testimony had been such as he says he expected and as he alleges the fact to be, we cannot conceive how it could have changed the result of the trial.

2. That relying on the said Brown, Thomason and Richardson to testify as they had said, and as he supposed they would,

he went to trial without the testimony of Jesse C. Seburn, who was under recognizance to attend to testify in his behalf, but who was absent from the court, by whom he would have proved that the deceased, on the same day of the killing, and only a few hours before it occurred, threatened the defendant's life.

It was not alleged that the threat had been communicated to the defendant before he killed the deceased; nor is there any evidence by which it might appear that the defendant, in taking the life of the deceased, acted under a reasonable apprehension of danger to his own life, or fear of receiving great bodily injury; and such threat, if the same had been communicated to him, could have afforded no justification or excuse for the killing of the deceased.

3. That the verdict was contrary to the evidence.

The deceased was killed at Springtown, in Benton county, on the 22d day of February, 1872, by the defendant, under the following circumstances: The defendant went into the store of the deceased to settle a small account the deceased had against him, which having paid, he remarked to the deceased: "Is this all right?" To which the deceased replied: "No, you owe me fifty cents for a half day's threshing, which I did for you two years ago." The defendant said, "how comes that? I hired hands at that time at seventy-five cents a day." The deceased said, "you can't hire me at that." The defendant then said he was to pay that in work, to which the deceased replied: "Well, you can pay it in work." The defendant then asked, "what do you want done?" The deceased said that he had no work but his wood pile to chop up, which defendant might do; to which defendant replied, he was not round cutting wood. The defendant started to go out, when deceased said to him: "You have got it to pay before you leave town;" and, putting a weight in his pocket, came from

behind his counter and followed the defendant to the door. The defendant, when he came out, took up a stick about as large and as long as a chair post, and stood at the door until the deceased came to it, when he seized the deceased by the collar, as most of the witnesses say, or, perhaps, as one of them says, they simultaneously seized each other, and a struggle ensued, in which the deceased kicked the defendant several times, and the defendant struck him twice with his fist and attempted to strike him with the stick. The defendant, after it was over, having dropped the stick in the struggle, started off, but stooping and seemingly endeavoring to get something out of his boot, when the deceased threw the weight and struck him on the back, and the defendant trying to get the weight, the deceased followed up and, another scuffle taking place over the weight, the deceased pushed or threw the defendant down and jumped on and beat him on the face and head, causing the blood to flow. The defendant called to persons standing by to take him away, which was done, when the deceased said he was done and would not hurt him any more. The defendant again started to leave; but when he had gone eight or ten steps he stooped, and, drawing a pistol, a six shooter, from his bootleg, cried out, "get out of the way, I'll be d—d if I don't kill." The deceased, who had from the time he was pulled off the defendant, ceased all hostile demonstrations, and was then fifteen or twenty steps from the defendant, said : "Don't shoot, judge; I don't want any more fuss." The defendant immediately fired at the deceased; when the deceased, drawing a derringer pistol, the barrel of which was only two or three inches in length, from his pocket, in turn, fired at the defendant, who, about the same time, perhaps one or two seconds after, fired again at the defendant. After the deceased shot, he immediately started to go into Herd's store, when the defendant fired a third and fourth time at him. He was hit,

and shot in the left thigh, by the defendant's second or third shot, and died from the wound in fifteen or twenty minutes.

Not the least necessity from urgent or pressing danger to the defendant, for taking the life of the deceased, appears. On the contrary, the evidence shows that the deceased, at the time the defendant drew his pistol and made the assault upon him with it, had withdrawn from the combat, and ceased all efforts to continue the fight; and the defendant, if he had wished, might have gone his way without hindrance or further harm ; but with full knowledge that the deceased had ceased fighting, he voluntarily renewed the fight, and by his language and the use of a dangerous and deadly weapon, evidenced his purpose and intention to kill the deceased.

The verdict was, therefore, fully warranted by the evidence.

4. That the verdict was contrary to law and the instructions of the court.

From the above statement of the evidence, and what we have said concerning it, there is no occasion for any remarks upon this ground of the motion.

5. That the court erred in its instructions to the jury.

The court gave the jury quite a lengthy charge, applicable to the evidence before them, defining the several grades of homicide, and distinguishing with much particularity between murder, manslaughter, and justifiable or excusable homicide. No part of said charge was specially excepted to, but the whole as an entirety. The counsel for the appellant, however, only insists here that the following remark was objectionable, as calculated to prejudice the minds of the jury against the accused : "I charge you that the state must prove all the material allegations in the indictment beyond a reasonable doubt: 1st. That said murder was committed in Benton county, state of Arkansas. 2d. That said offense was committed some time prior to the finding of said indictment. 3d.

That said defendant did willfully, feloniously, and with malice aforethought, kill and murder the said Ephraim M. Thomason by shooting him with a pistol."

He contends that the court, by saying "said murder," virtually assumed the defendant to be guilty, and thereby prejudiced the jury against him. But such an objection is manifestly without foundation, for in the same sentence they were instructed that the state should prove that the defendant did willfully, feloniously and of his malice aforethought, kill and murder the deceased; and in another part of the charge they were instructed not to find him guilty of any offense, unless upon conclusive proof thereof, and beyond a reasonable doubt; and that the remark had no such prejudicial influence upon the jury is evident by their finding him not guilty of murder, but of manslaughter only.

We find no objection to the charge of the court; it fairly and correctly stated the law applicable to the evidence in the case.

6. That the court improperly excluded from the jury the evidence of William L. Gibson, a witness produced by the defendant.

The evidence proposed to be given by this witness was : that he heard the deceased say, at Springtown, in Benton county, within a week of the time he was killed, that he intended to kill the defendant, and at the time showed witness a derringer pistol, with which he said he intended to do the "work." It was not attempted or offered to be proven, that this threat had been communicated to the defendant before the killing took place, and even if it had, we are at a loss to see how such evidence, under the circumstances attending the killing, could have affected or changed the result of the trial.

There was, therefore, no error in its exclusion.

7. That the verdict was not responsive to the issue.

An indictment for murder charges, also, all the lower grades of felonious homicide; and a conviction for manslaughter may be had upon it. Gantt's Dig., secs. 1961, 1962; 1 Bish. Crim. Law, sec. 807; 1 Bish. Crim. Process, sec. 835; 1 Russ on Crimes, 655; 1 Hale P. C., 449. Finding a verdict of manslaughter upon an indictment for murder, is equivalent to an acquittal of the charge of murder. *Johnson v. The State, ante,* p. 31.

8. That the court refused to give the following instruction to the jury.

1. "If the jury believe from the evidence that the acts and conduct of the deceased, upon the occasion of the killing, and immediately preceding it, were of such a character as to furnish the defendant reasonable ground to believe that the deceased was then and there about to take the life of the defendant, or to inflict on him great bodily harm, and that the defendant acted on them and such belief founded thereon, and for the purpose of protecting himself, shot and killed the deceased, they should find the defendant not guilty.

2. "If the actions of the deceased immediately before the killing were of such a character as to warrant the defendant in coming to the conclusion that his life was in danger, or that he was in danger of great bodily harm at the hands of the deceased, and that such danger was imminent, the defendant had a right to act on such apprehended danger, and that it is not material whether the deceased then and there intended to kill the defendant or not, or whether he intended to do him such great bodily harm, if the act of the deceased, and his conduct then and there, furnished to the defendant reasonable grounds to believe that the deceased so intended, and that the danger was imminent."

These instructions are predicated upon the principle of natural law, that a person assaulted may take the life of his as-

sailant, when necessary for the preservation of his own life, or to prevent his receiving great bodily injury ; but they do not truly present the conditions and circumstances under which the right exists, or may be exercised. A necessity for taking the life of the other is the controlling circumstance which justifies or excuses the act, and before resorting to such extremity, the party must employ all means within his power, consistent with his safety, to avoid the danger and avert such necessity. We would not, however, be understood as saying that he must have used all possible means, for in some cases, the assault may be of so fierce and violent a character, that there would be as much or more danger in attempting to escape as there would be to stand and repel it; but he must seek such as his safety would reasonably dictate.

The statute, sec. 1285, Gantt's Dig., which is but an enunciation of the doctrine of the common law, says : "In ordinary cases of one person killing another in self defense, it must appear that the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily injury, the killing of the other was necessary, and it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further contest before the mortal blow or injury was given."

In the proposed instructions, the duty of the defendant to endeavor to avoid the supposed danger before taking the life of the deceased is not stated, but the existence of the danger alone is declared a sufficient justification of the killing. The further objection to them may be mentioned, that the evidence was not such as to conduce to, or afford the defendant a reasonable ground for the belief that the deceased, at the time the defendant made the assault on him with his pistol, was intending any further assault on him, or that he was in any danger.

The fight was over; the deceased had no weapon drawn, nor had he exhibited any, except the weight he threw, and all hostile demonstrations on his part had ceased, and the defendant himself had started to leave, and had walked away some eight or ten steps.

The court very properly declined to give the instructions, and it did not err in overruling the motion for a new trial.

The grounds of the motion in arrest of judgment were:

First. That no public offense is charged in the indictment.

Second. That the indictment does not charge the defendant with the offense of which he was found guilty.

Third. That he had never been legally arraigned.

Fourth. That the court had no jurisdiction of the case; and

Fifth. That the verdict was special and did not state sufficient facts upon which judgment might be rendered.

The indictment, which is in the form prescribed in sec. 1797 of Gantt's Digest (section 121 of the criminal code), charges the defendant with the crime of murder in the first degree, and alleges it to have been committed as follows: That "the said James H. McPherson, on the 20th day of February, A. D. 1872, in the county of Benton aforesaid, did feloniously, and with malice aforethought, and with premidi-tation, and by lying in wait, kill and murder Ephraim M. Thomason, by then and there shooting him with a pistol, then and there loaded and charged with gunpowder and six leaden bullets, against the peace and dignity of the state of Arkansas."

This indictment is similar in averments and allegations to that in the case of *Dixon v. The State, ante,* p. 165, and we think, as we held in that case, that it contains every necessary and material averment to charge the crime of murder, and with sufficient certainty and particularity, states the manner and means of its perpetration, to enable the defendant to

know with what he is charged, and to make his defense. Gantt's Digest, secs. 1781, 1782, 1796.

We have, when considering the seventh ground of the motion for a new trial, fully answered the objection next raised, that the defendant is not charged in the indictment with the offense of which he was convicted, and shown that a person indicted for murder may be convicted of manslaughter.

The third ground assigned seems to have been inadvertently inserted, as the record contains a formal entry of the arraignment, and the defendant's plea of not guilty thereupon, previous to the trial.

No reason is shown, or indicated in the motion in arrest, for the fourth ground assigned therein, which is, that the circuit court of Washington county had no jurisdiction of the case, and none has been offered or suggested by the defendant's counsel here, and we are, therefore, left to conjecture upon what the objection is based. We can conceive of no other foundation for it than a question as to the authority of the circuit court of Benton county, in which the indictment was found, to change the venue and transfer the cause to the circuit court of Washington, and we will proceed to consider that question.

The code of criminal practice, previous to the amendment thereof by the act of 1873, contained no provision for a change of venue; but, by section 196 (section 1898 Gantt's Digest), provided that "where the judge is satisfied, after having made a fair effort in good faith for that purpose, that from any cause it will be impracticable to obtain a jury free of bias in the county wherein the prosecution is pending, he shall be authorized to order the sheriff to summon a sufficient number of qualified jurors from some adjoining county in which he shall believe there is the greatest probability of obtaining impartial jurors, and from these so summoned the jury may be formed."

If the provision in chapter 52 of Gould's Digest, by which a change of venue was allowed the defendant, when the minds of the inhabitants of the county in which the cause is pending are so prejudiced against him that a fair and impartial trial cannot be had therein, were repealed by the code, then the circuit court of Washington county did not have jurisdiction of the case. There was no express repeal; and, if repealed at all, it must have been by a necessary implication.

"A statute," says Dwarris, "can be repealed only by an express provision of a subsequent law, or by necessary implication. To repeal a statute by implication, there must be such a positive repugnancy between the provisions of the new law and the old, that they cannot stand together or be consistently recognized." Dwar. Stat., 155. And Sedgwick says: "A general statute, without negative words, will not repeal the particular provisions of the former, unless the two acts are irreconcilably inconsistent." Sedg. Stat. Law.

There is, however, another rule of construction sometimes employed, which we should perhaps notice, which is, that where the legislature takes up a whole subject anew, covering the whole ground, revising the whole subject matter of a former statute, and evidently intending to enact a substitute, the old statute is repealed, although the new statute contains no express words to that effect. The code, however, does not attempt to provide for and regulate everything which relates to, or every proceeding which may be had in, the administration of the criminal law, and it expressly repeals the former laws on the subject of criminal procedure, only so far as the same were inconsistent with its provisions. Section 412.

The rule last referred to does not, therefore, have any application to the question we are considering, and it is clear that the statute in Gould's Digest authorizing a change of venue, for the cause stated therein, was not repealed by the code,

either by a direct implication from said section 196, or the failure or omission to provide by it for such change, and that the circuit court of Washington county had jurisdiction of the cause.

The remaining objection, that the verdict is special and does not state sufficient facts upon which judgment might be rendered, is not true in point of fact. The verdict was not special, but general and directly responsive to the indictment. And section 1961, Gannt's Digest, expressly provides that, upon an indictment for an offense consisting of different degrees, the defendant may be found guilty of any degree not higher than that charged in the indictment, and may be found guilty of any offense included in that charged in the indictment. The verdict, as recorded, is as follows: "W.e, the jury, find the defendant James H. McPherson guilty of manslaughter, and assess his punishment at three years in the penitentiary." This is a verdict of voluntary manslaughter, as the imprisonment for involuntary manslaughter is for a period not exceeding twelve months, according to the provisions of section 1962, id., which says that, "where the punishment is the same in kind, the amount that may be inflicted fixes the degree."

Finding no error, the judgment of the court below is affirmed.