## BROWN vs. STATE.

1. CRIMINAL LAW: *Practice in supreme court, punishment reduced.*
 Where, in a prosecution for manslaughter, the court instructs the jury that if they find that the defendant killed the deceased, as charged in

(DIAGRAM A.)

Brown vs. State.

the indictment, they will fix his punishment at imprisonment in the penitentiary for a term not less than two, nor more than seven, years; and the jury return a verdict for manslaughter, without saying whether *voluntary* or *involuntary*, and fix the punishment at two years' imprisonment; and it does not appear from the bill of exceptions that the jury were informed what punishment the statute prescribes for *in*voluntary manslaughter, and there is a doubt whether the jury were informed or knew that they might find the defendant guilty of manslaughter and fix his imprisonment at *one* year or less; and it also appears that the evidence would warrant a verdict for *in*voluntary manslaughter, the supreme court will not reverse the judgment where there was no objection to the instruction, nor motion for a new trial on account of it, but will give the defendant the benefit of the doubt, and reduce his imprisonment to one year.

APPEAL from *Desha* Circuit Court.

Hon. J. M. PINNELL, Special Judge.

*Attorney General Henderson* for appellee.

ENGLISH, C. J. Isaac Brown was indicted in the circuit court of Desha county for murder; the indictment charging him with killing Joseph Brooks, Jr., by shooting him with a double-barreled shot-gun.

He was tried on the plea of not guilty, and the jury returned a verdict of guilty of manslaughter, and fixed his punishment at imprisonment in the penitentiary for four years, and on his motion the court granted him a new trial.

He was again put on trial for manslaughter, and the jury found him guilty of manslaughter, failing to state whether voluntary or involuntary, but fixed his punishment at imprisonment for two years in the penitentiary.

The court refused him a new trial, sentenced him in accordance with the verdict; he took a bill of exceptions, and was allowed an appeal by one of the judges of this court.

On the trial, Daniel Deboid, a witness for the state, testified in substance that he was at the house of Daniel Debose, on Capt. Pat Henry's plantation, in Desha county, in July, 1875, where and when Joseph Brooks, Jr., was shot. He and Brooks, after eating dinner in the house of Debose, came out on the gallery. The house had two rooms, separated by a partition wall without a door. There was a gallery in front of both rooms, with a picket division about the middle, separating one room from the other. There was a small yard fenced in front of the house, and a picket fence running from about the middle of the house to the front of the yard, dividing the lot into two parts, with a gate in front of each room. When witness and Brooks came out from dinner, on the gallery, Isaac Brown was standing on his gallery, and threw a cup of water across the division in the gallery on Brooks, and Brooks threw a cup of water back at him. Brown then went into his room; Brooks went out at the front gate of the yard of Debose, entered Brown's yard, went up to the house, and as he stepped into the door of Brown's house, witness heard some one say, "*Take care, take care; I will shoot you.*" And immediately a gun fired, and Brooks said, "Uncle Isaac, you have shot me, and I would not have done a dog that way." In a few minutes witness went into Brown's room, and found Brooks shot near the groin with small shot. There was no one in the room at the time of the shooting, except Brown and Brooks. Witness assisted Brooks to his brother's house.

SANDFORD BROOKS, second witness for the state, testified that he also dined with Debose, came out on to the gallery with Deboid and Brooks, saw Brown throw a cup of water on Brooks, and Brooks throw a cup of water back at him, walked a short distance behind Brooks when he

went into Brown's yard, and as Brooks stepped up into Brown's door, witness heard some one in the house say, " Give me my gun ;" and immediately heard the report of the gun; went into the house and saw Brown with a shotgun in his hand, with smoke coming out of the muzzle, and Brown set the gun down in a corner. As soon as the gun fired, witness heard his brother say, " Uncle Isaac, you have shot me, and I would not have done a dog that way." There was no one in the house at the time of the shooting, except Brown and Brooks. Brooks was removed to the house of his brother, Peyton Brooks, where he remained the following night; next day he was taken on a bed, in a wagon, to the house of his father, about seven miles off, and died on the following morning about daylight.

JOSEPH BROOKS, the father of the deceased, testified that he asked his son how all this happened, and he stated that Brown took the gun and shot him, when he ought not to have done it. This he repeated several times, and the last time he told him this, the contents of his bowels were running out behind, and he died in five minutes.

J. G. WARFIELD, for defense, testified that he acted as attorney for the prisoner ·before the ·examining court. That Peyton Brooks, who had since died, was sworn and examined by the magistrate, and testified that Joseph Brooks, Jr., had made dying declarations to him, and stated that Brown shot him, but they were playing, and Brown was not to blame.

ALEX. PITTMAN, was at Brown's room a few moments after Brooks was shot, and heard him say that Brown had shot him, but did not intend to do it, and was not to blame. Brown seemed sorry about the affair, and sent for the doc-

tor, and helped, or was along, when Brooks was removed to his brother's house.

. DANIEL DEBOSE, on hearing the gun fire, went into Brown's room, where he found Brown, Brooks and others. Brooks had been shot; was standing up; when asked how he was shot, he said that Brown had shot him, but that they were playing, and that Brown did not mean to do it, and was not to blame. Brown sent for the doctor, and seemed to be very sorry about the shooting. etc.

On behalf of the state, the court gave to the jury seven instructions, the defendant objecting only to the second, third, fourth and fifth.

On motion of the defendant, the court gave the jury five instructions.

Taking the four instructions given for the state, to which the defendant objected. and the five given for him, together, and they, in effect, announced to the jury the statutory definitions of voluntary and involuntary manslaughter, and excusable homicide. *Gantt's Digest, secs. 1264–5–6, 1292.*

The defendant having been, in legal effect, acquitted of murder in the first and second degrees by the first verdict, was on trial for manslaughter only, and this the court gave the jury to understand by the first instruction given for the state, as well as the first given for defendant.

But in the first instruction given for the state, and to which the defendant did not object, the court said to the jury, in effect, that if they believed from the evidence that defendant shot and killed Brooks, as charged in the indictment, they would find him guilty of manslaughter, and assess his punishment in the penitentiary for a period of not less than two nor more than seven years.

This is the punishment prescribed by the statute for *voluntary* manslaughter. *Gantt's Digest, sec. 1277.*

The punishment for *involuntary* manslaughter is imprisonment in the penitentiary for a period not exceeding twelve months. *Ib., sec. 1278.*

The jury returned a verdict for manslaughter. but did not indicate whether *voluntary* or *involuntary*, otherwise than by fixing the imprisonment for a longer period than is allowed by the statute for *involuntary* manslaughter.

It does not appear from the bill of exceptions that the court informed the jury, or was asked by the state or the defendant, to instruct them what punishment the statute prescribed for involuntary manslaughter. We can hardly believe that the court omitted to do so, in a case like this, when the verdict might have been for the one or the other offense upon the evidence, and when the court in the instructions which appear, by the bill of exceptions, to have been given, thought proper to define the two species of manslaughter.

In *McPherson v. State, 29 Ark., 225, 238,* the verdict of the jury was for manslaughter, without indicating whether voluntary or involuntary, but it fixed the imprisonment of the accused at three years in the penitentiary, and the court held that the amount of punishment inflicted fixed the degree of the offense, under *section 1962, Gantt's Digest.* In that case, however, it was manifest from the evidence that the accused was guilty of murder or voluntary manslaughter; and it was sufficiently indicated by the period of imprisonment fixed by the verdict, that the jury intended to find him guilty of voluntary manslaughter. A verdict of involuntary manslaughter would have been inappropriate to and unwarranted by the evidence.

In *Winkler v. State, 32 Ark., 552,* the court instructed the

jury that if they found the defendant guilty of man-
slaughter, they should assess his punishment by imprison-
ment in the penitentiary for any period not less than two
nor more than seven years, the court failing to discriminate
between the two grades of manslaughter.

There was a verdict for manslaughter, and the punish-
ment of defendant fixed at imprisonment in the peniten-
tiary for two years.

The defendant objected to the giving of the above in-
struction, and made the overruling of the objection ground
of his motion for a new trial.

MR. JUSTICE TURNER, who delivered the opinion of the
court, said: "The jury, we have no doubt, intended to
find the defendant guilty of voluntary manslaughter, with-
out so declaring in words, for the penalty clearly indicated
this purpose, and we should have no hesitation in treating
the verdict as for voluntary manslaughter, were we clearly
of the opinion that the evidence authorized such a finding,
but as we are not satisfied on that point, and as the finding
might have been different, had the court declared and ex-
plained to the jury the distinction and difference of pen-
alty, in the two grades of manslaughter, the judgment
must be reversed," etc.

In the case now before us, the prisoner did not object to
the first instruction moved for the state, nor make the giv-
ing of it ground of the motion for a new trial, and, in this
respect, this case differs from Winkler's case.

Possibly, however, the jury may not have known, or
been informed, that they might find the prisoner guilty of
manslaughter, and fix his punishment at imprisonment in
the penitentiary for one year or less, and whilst we are not
willing to reverse the judgment and remand the case for a
new trial, we will give him the benefit of a doubt, and

modify the judgment of the court below so as to reduce his imprisonment to one year from the date of his conviction, under *section 1103, of Gantt's Digest.*

The appellant was sentenced to the penitentiary for two years from the tenth of March, 1879. A judgment will be entered here, and certified by the clerk of this court to the keeper of the state prison, modifying the judgment of the court below so as to reduce the period of his imprisonment to one year from the tenth of March, 1879.