## SIMPSON v. STATE.

### Opinion delivered April 2, 1892.

1. *Escaped felon—Right of officer to arrest.*

    A peace officer may lawfully arrest without warrant a convicted felon found outside the walls of the state penitentiary without a guard, although he left the prison with the warden's consent and intending to return.

2. *Unlawful killing not presumed murder in first degree.*

    On a trial for murder it was proved that deceased's death was caused by a blow upon the back of the head inflicted by defendant, apparently with a round stick. The skull was not fractured, but a blood vessel was ruptured. Defendant testified that, in an effort to escape lawful arrest by deceased, a policeman, he struck at deceased with his pocket knife, and a small knife wound was found on one of deceased's arms. There was no eye witness to the killing. The blow which caused the death would not ordinarily produce that result. *Held*, that while the law presumes that an unlawful killing is malicious, it does not presume that it is premeditated ; that the evidence did not sustain a verdict of murder in the first degree.

3. *Sentence of murder in first degree—Modification on appeal.*

    Where, on appeal from a conviction of murder in the first degree, the evidence is insufficient to establish the premeditated inten-

tion to take life, which is an essential ingredient in the crime of murder in the first degree, but does establish the crime of murder in the second degree, and where no other error appears, the sentence of murder in the first degree will, with the approval of the Attorney General, be set aside, and the cause be remanded to the circuit court with directions to sentence the prisoner for murder in the second degree.

Appeal from Pulaski Circuit Court.

ROBERT J. LEA, Judge.

This is an appeal from a judgment of death pronounced against the appellant by the Pulaski circuit court at its October term, 1891. He was charged with the murder of W. L. Copeland, a policeman of the city of Little Rock, who was in the act of arresting him when he was killed. Appellant was at the time a convict in the state penitentiary, but was allowed to go outside of the prison walls at certain times as a special privilege in recognition of his good behavior. The witnesses in the case testified substantially as follows :

Dr. Scott testified : "I am a practising physician. I was called to see Copeland on the night of the killing, about 8 o'clock. He was unconscious, and never gained consciousness while I was attending him. There was a wound in the temple (I think the left temple), but it did not penetrate the skull ; also a blow on the head, which I think caused a rupture of a blood vessel. I think the blow on the head caused Copeland's death. It might have been made with a round stick or chair round. There was also a cut on the arm."

Mrs. Copeland testified : "On the evening of the killing my husband left home about 7 o'clock to go on night watch. Soon after he left I heard a pistol shot, but paid no attention to it, because before he left home he said he intended to kill a dog. When he was brought home he was cut on the arm and had a wound in the temple and back of the head. He died the same night about 12 o'clock."

A. L. Donnelly testified: "I remember the night Copeland was killed. I had lit the lights in my saloon. I saw a man standing with a bundle under his arm; I noticed his hair was full of dirt and matted, and he was bloody; saw it was Copeland. I washed him off; he tried to speak, but could not. I tried to get him to go with me, but he would not. I finally got some of the boys to take him by the arm, and I went ahead and he followed me. While we were on our way to the drug store, he went along very well, until he looked around and saw a man hold of him. He pulled back and tried to strike this man; he did not want this man to touch him at all. We finally got him to the drug store, and we went to where the difficulty occurred. We found a pistol with one chamber empty, at the corner of Fifth street and Rector avenue, or near there. I saw where Copeland fell in the street. There was a pool of blood in the street. There was evidence of a scuffle from where we first saw blood to where Copeland fell. Copeland was a much larger man than the defendant. The killing occurred in Pulaski county, December 30, 1885. The man that Copeland objected to taking hold of him was a dark brown-skinned man, and resembled defendant very closely. We found the pistol near the steps, some little distance from where Copeland fell. The bruises on the head seemed to have been made with a blunt instrument. A chair round or a policeman's club would have made the same kind of wound."

E. H. Sanders testified: "I am chief of police of the city of Little Rock. The defendant was turned over to me by the sheriff of Ouachita county. He sent for me and made the following voluntary statement:

"'I and one John McMillen were out with a pass permitting us to be out until 10 o'clock. We were going out Fifth street toward Rector avenue, when we were hailed by deceased, who was on the opposite side of

Rector avenue. We stopped, and while deceased was looking at my pass John McMillen struck him ; deceased fired one shot, and we both ran. John McMillen was as much implicated as I was.' "

Sam Speight testified : " I am city detective of Little Rock, and was acting in that capacity when deceased was killed. Defendant stated to me that McMillen knocked deceased down. while he was looking at the pass."

Frank Botsford testified : " I was chief of police of Little Rock at the time the deceased was killed. He was assigned at the time, and had orders, to arrest all convicts at large, whether they had a pass or not. I do not know of any understanding with the penitentiary authorities that convicts having a pass would be exempt from arrest. The police force had orders to arrest convicts at large. The next day a piece of paper was handed to me, said to have been found near the place of difficulty. It had small spots of blood on it, and was a pass for Louis Simpson to be outside the walls until 10 o'clock. The pass is here produced and identified, and is as follows : ' Louis Simpson has permission to be out of the walls till 10 o'clock to-night. G. A. Leiper, Warden. Dec. 30, 1885.' " On cross-examination by the defendant, witness stated that there was at the time of the killing a city ordinance " prohibiting convicts from roaming at large in the city without a good and sufficient guard, and making it a misdemeanor."

Dave Adams testified : " I was city detective at the time policeman Copeland was killed. I went down to Fifth street and Rector avenue the next morning ; saw evidence of quite a scuffle, a large pool of blood in the street, and some blood near the sidewalk."

Geo. A. Leiper testified : " I was warden of the penitentiary when Copeland was killed. Simpson was a convict at that time ; was what is known as a ' trusty,'

and was allowed to go out of the walls as a privilege for good conduct. He always conducted himself well, and gave us no trouble. He had a pass the night of the killing, and did not return to the penitentiary."

Defendant testified: "My name is Louis Simpson. My former home was at Camden, Ouachita county. I was sent from there to the penitentiary. On the night of the difficulty between the policeman and myself, I was outside the walls by permission of Mr. Leiper, the warden at the time. He gave me a pass to be out until 10 o'clock, and told me not to get into trouble and let the officers grab me up. I left the walls about 7 o'clock, taking with me some clothing I intended to have washed. I was going east on Fifth street when deceased hailed me and told me to throw up my hands, which I did. I had on my stripes. He came up to me and told me he would have to arrest me because I was a convict. I presented the pass given me by Mr. Leiper, and he remarked, 'This ain't worth a damn,' and took hold of me. I resisted; we had a scuffle. I broke loose from him and started to run, when he fired and I fell. I lay still; he came up to me and walked around and up to me, and as he leaned over me and started to put on the nippers, I struck him with a knife. I jumped up and he fired again, and I ran down another street and went out to St. John's College. I then went to the southeast corner of the prison walls, and intended to go in, but I did not know how bad I had injured Copeland, and I made up my mind to leave, which I did. I was acquainted with Copeland. I had never had any trouble with him or with any of the officers. I had been in the habit of passing and re-passing, just as I did that night. I don't recollect of ever speaking to the deceased in my life. I knew that, if I failed to get back to the pen on time, I would be flogged and put back in the ranks, and I tried to get loose from deceased.

"There was no one with me. I did not strike him with anything. Deceased fired two shots when I ran from him. He fired and I fell, when he fired again and came toward me and walked around me, and as he came up near me and leaned over me, and I was lying on my side, I struck at him with my knife. Don't know when I opened the knife; don't think I had it open when I ran from the deceased. I was so scared that I hardly knew what I was doing. I was trying to get away. I had my pass, and I thought I had a right to be out. I had never been molested before. I didn't strike at Copeland but once. Don't know when I got out my knife; don't know whether I hit him; didn't hit him with a stick— not anything but my knife. No one was with me. Mc-Millen was not with me that evening. I have told everything just as it occurred, to the best of my recollection. I made up my mind that it was no use to put anything on innocent people. When I escaped, I went around from one place to another. A man gave me a change of clothes, and I finally got to New Orleans, when I was arrested and brought back by the sheriff a few months ago."

*T. P. Johnson* for appellant.

1. The arrest was illegal. The deceased had no reason to believe that defendant had committed a felony, nor was any offense committed in his presence. 55 Am. Dec. 97. Deceased knew him to be a "trusty" out on pass. 53 Ark. 518.

2. It was error to admit parol testimony to prove a city ordinance. 35 Ark. 75 ; 1 Gr. Ev. p. 372 ; Wharton, Cr. Law, vol. 2, 659–661 ; 1 Phill. Ev. p. 19–20.

3. Defendant's confession must be taken as a whole. 12 Ark. 70 ; 14 *id.* 442.

4. The evidence does not make out a case of murder in the first degree. 15 Oh. St. 47 ; 1 Cr. Def. 220 ; Bish. Cr. Law (2nd ed.), sec. 656.

*W. E. Atkinson*, Attorney General, and *Chas. T. Coleman* for appellee.

1. Right of officer to arrest escaped felon.    COCKRILL, C. J.    The appellant had been legally sentenced to the penitentiary for a felony, and before his term had expired the warden of the penitentiary permitted him to leave the prison without a guard and go into the city of Little Rock, where he was recognized as a convict by a policeman named Copeland, who attempted to arrest him for the purpose of returning him to the prison authorities.    The officer had no warrant for the convict's arrest, the latter resisted, and in the rencounter the officer was killed.

The appellant was indicted for murder in the first degree, and was convicted of that grade of offense.    He complains of the following part of the court's charge to the jury, viz:    " The court instructs the jury that if they find that defendant was a convict at the time of the killing of Copeland, and was out of the walls of the penitentiary without a guard, and going at liberty within the corporate limits of the city of Little Rock, and that Copeland was a police officer of said city, that Copeland had the right and it was his duty to arrest the defendant."

He also complains because the court refused to charge the jury that if they found that he was at liberty by the consent of the prison warden, the officer had no authority to arrest him without a warrant, and that if he killed the officer in resisting arrest under such circumstances, his offense would be no more than manslaughter.    The only question of law arising upon the charge is thus presented.

A difference of opinion has been expressed upon the question whether an officer can re-arrest one whom he has held by virtue of a warrant of arrest and voluntarily liberated.

It may be that the divergence occurs only where the charge is a misdemeanor ; but, however that may be, we find no principle sustaining the position that an officer may not, without a warrant, legally arrest an escaped felon to restore him to prison, that the sentence of the law may be executed, whether the felon has escaped with or without the consent of his jailer. He may arrest without warrant one whom he has reason to believe has committed a felony, in order that he may be convicted if guilty ; and it would be anamolous if the authority is not equally as broad to bring a convicted felon to punishment.

A voluntary release of a convict from imprisonment by a warden or other person having legal custody of him is illegal, and the convict is an escaped felon so long as he is at liberty. The warden's guilty consent to his escape cannot abrogate the judgment of conviction and legalize his liberty for an hour or any other 'length of time. *Griffin* v. *State*, 37 Ark. 437 ; *Martin* v. *State*, 32 *id*. 124. To hold that it could would be to recognize in him a limited power of pardon which the law has vested in the Governor exclusively.

The controlling question is not whether the convict is guilty of a felony (which of itself might subject him to re-arrest) in leaving the prison with the warden's consent, intending to return ; but it is whether he is legally at liberty. If he is not, any peace officer may arrest him, without a warrant, to restore him to the imprisonment to which the court has sentenced him. 1 Bish. Cr. Pr. sec. 163 and n. 2 ; *id*. secs. 1382-3 ; Crocker on Sheriffs, secs. 74 and 597 ; *Schwamble* v. *Sheriff*, 22 Pa. St. 18 ; *Clark* v. *Cleveland*, 6 Hill, 344 ; *Gano* v. *Hall*, 42 N. Y. 67 ; *Haggerty* v. *People*, 53 *id*. 476 ; *State* v. *Holmes*, 48 N. H. 377 ; *Com*. v. *Carey*, 12 Cush. 246.

The complaint against the charge of the court is without foundation.

The other assignments of error made by the appellant are not sustained by the record, and need not therefore be noticed. The motion for a new trial, however, challenges the evidence as insufficient to sustain a sentence of murder in the first degree, and that question has given us much concern.

2. No presumption that killing was premeditated.

As death ensued in an unlawful attempt to escape or to resist lawful arrest, and there was no evidence of mitigating circumstances, the jury could not consistently have reached any conclusion other than that the killing was murder. But there are two grades of murder, and a premeditated intention or a specific intent to take life is an indispensable ingredient of murder in the first degree. *Bivens* v. *State*, 11 Ark. 455. "An unlawful killing may be presumed murder, but it will not be presumed murder in the first degree. The burden of proving it so lies on the Commonwealth." *Johnson* v. *Commonwealth*, 24 Pa. St. 386. As was said by Judge Agnew in administering the Pennsylvania law, which is similar to ours : "If, from all the facts attending the killing, the jury can fully, reasonably and satisfactorily infer the existence of the intention to kill, and the malice of heart with which it was done, they will be warranted in so doing. He who uses upon the body of another, at some vital part, with a manifest intention to use it upon him, a deadly weapon, as an axe, a gun, a knife or pistol, must, in the absence of qualifying facts, be presumed to know that his blow is likely to kill ; and, knowing this, must be presumed to intend the death which is the probable and ordinary consequence of such an act." *Commonwealth* v. *Drum*, 58 Pa. St. 9.

But, in the absence of other proof, one is presumed to intend only the probable or ordinary consequence of his act ; and if death is the consequence of an act that would not probably or reasonably produce that result, malice, it may be, is presumed from the fact of killing,

but there is no presumption of a deliberate purpose to kill.    The presumption can be raised only as a legitimate inference from facts or circumstances in proof.    Presumptions of fact must rest upon fact, and not upon surmises or guesses at what is not proved.    In this case there was no eye witness to the homicide.    The defendant testified in his own behalf, and admitted that he had resisted the officer and made his escape, but denied striking the fatal blow or any blow with a stick or like weapon. The jury were warranted, however, in finding that he struck the fatal blow.

But what was the evidence that the killing was premeditated?    A brief outline of the case has been given already.    The statement of the details will be left to the reporter.

The character of the wounds, the conduct of the prisoner in using the knife, his contradictory statements, his motive for resisting the officer and his subsequent flight constitute the leading features of the evidence against him.    There is nothing in either the third, fourth or fifth heads which can of itself be said to prove the specific intent.    They can only be used to throw light upon other facts in proof and aid in extracting the truth from them.    If no inference of a specific intent can be drawn from the other facts, the prisoner's motive and the fact of flight will not warrant the inference ; and his contradictory statements only tend to prove that he struck the fatal blow.    What evidence did the wounds themselves disclose ?

A blow upon the back of the head caused the death. It was inflicted apparently with a round stick.    The skull was not fractured, but a blood vessel was ruptured, and that caused death.    We know nothing else in reference to the blow.    It is not even shown that it broke the skin.    A light blow at the base of the brain may, without a break of the skin, rupture a blood vessel, which in

due course of time may produce paralysis of speech, and afterwards stupor, and finally death—just the effects the proof shows upon the deceased in this case. But death is not the probable or ordinary consequence of striking a light blow, and proof of inflicting it does not therefore raise a presumption of the deliberate purpose to kill unless it is made to appear that it was probably given with that intent. But there is no proof in the case that it was, outside of the fact of death which, as we have seen, is not in itself sufficient. A blow similar to the one already described was inflicted upon the temple of the deceased, but it was not delivered with force enough to fracture the skull, and the evidence shows that it did not conduce to the death. There is nothing from which we can draw the inference that it was not as severe as the blow on the back of the head. It furnishes as much, but no greater, evidence of the intent to kill than the other wound.

The defendant testified that he struck at the deceased with his pocket knife in his effort to escape, and a knife wound was found on one of the deceased's arms. That is the circumstance in the case which has given me trouble. The stealthy and deliberate use of a knife, which the prisoner detailed when on the stand, may have afforded the jury the right to infer that he entertained the specific intent to kill, and, having the existence of the specific intent established in the rencounter in which life was taken, why should it not be presumed to continue to the striking of the fatal blow? But the knife used was a pocket knife, the size of which was not proved; the wound inflicted with it was not shown to be of a severe or vicious character; it is not known that its use preceded the striking of the fatal blow; and the blow which caused the death would not ordinarily produce that result. For these reasons and from a general view of the testimony, my brother judges express the abiding

conviction that the prisoner's design was escape from arrest only and not the taking of life, and that sentence for the first degree of murder cannot be sustained upon the proof which the record affords. What, then, should be the judgment in the cause?

The only error committed is in the excess of the punishment. In other States where statutes authorize the appellate courts to modify the judgments of the circuit courts in criminal cases, the remedy in cases like this is found, not in a new trial, but by reducing the punishment to make it appropriate to murder in the second degree. The courts find no constitutional obstacle to such a practice. *State* v. *Fields*, 70 Iowa, 196; *State* v. *McCormick*, 27 *id*. 402; *Hogan* v. *State*, 30 Wis. 438–9; *Johnson* v. *Com*. 24 Pa. St. 386.

3. Sentence of murder in first degree modified on appeal.

In this case the jury have found the prisoner guilty of murder; but having found a degree of murder which the proof does not warrant, the verdict stands for the offense of murder, and fails as to the degree. It is then as though the jury had found him guilty of murder but failed to assess the punishment. The two degrees of murder are not distinct offenses—they are only statutory regulations of the punishment of the one offense of murder, to be inflicted according to the mental state in which the crime is committed. *Thompson* v. *State*, 26 Ark. 323; 2 Bish. Cr. Pr. sec. 565.

It is true the statute requires the jury to find the degree of murder; but that is done for the purpose of having them take into consideration the distinguishing features of the two degrees, in order that the prisoner may not be sentenced to capital punishment without a special finding for the first degree. If their verdict does not show the intention to find the first degree, no sentence for that degree can follow. And if the verdict is "guilty as charged," no sentence for murder can be pronounced, because, other grades of homicide being charged

in the indictment, it is not known that a verdict of murder was intended. *Thompson* v. *State*, 26 Ark. *sup.;* *Curtis* v. *State, ib.* 439; *Trammell* v. *State, ib.* 534.

But all murder which is not of the first degree is of the second; and when there is a verdict for murder and no punishment is assessed by the jury, the prisoner is not prejudiced if the verdict is referred to the lower degree of the offense. It is the established practice under our statute that a new trial shall not be awarded for an error not prejudicial to the prisoner. *Hayden* v. *State*, 55 Ark. 342; *Cline* v. *State*, 51 Ark. 145.

The appellant may therefore be sentenced for murder in the second degree. The case of *Brown* v. *State*, 34 Ark. 232, is authority, if further authority were needed, for such a modification of the punishment. In that case the verdict was for manslaughter, without indicating whether it was for voluntary or involuntary manslaughter. The term of imprisonment fixed by the verdict was greater than the highest punishment authorized for involuntary manslaughter. The court modified the judgment of conviction by reducing the punishment to the highest term authorized for involuntary manslaughter.

The Attorney General, on behalf of the State, prefers a conviction for murder in the second degree to a reversal for a new trial.

The sentence for the first degree of murder will be set aside, and the cause remanded to the circuit court with directions to sentence the prisoner for murder in the second degree.

It is so ordered.

BATTLE, J., dissenting. I do not concur in the judgment of this court; but think that a new trial should be awarded to the appellant.

The appellant was indicted for murder in the first degree, and the jury found him guilty of that degree of

homicide.    This court finds that the verdict was not sustained by the evidence, but that he was guilty of murder in the second degree, and that it can remand the cause to the lower court with instructions to enter judgment accordingly.    I do not think that it has the right to render, or to authorize the circuit court to enter, such a judgment.

At common law a court of error had no power, when it reversed a judgment against a prisoner in a case of treason or felony, to remand the record to the court below for the proper judgment, or itself to pronounce such judgment as the law authorized ; and all it could do was to discharge the defendant.    *Stewart* v. *State*, 13 Ark. 745; *McDonald* v. *State*, 45 Md. 91; *Rex* v. *Ellis*, 5 Barn. & Cress. 395; *Rex* v. *Bourne*, 7 Ad. & Ellis, 58 ; *Silversides* v. *Queen*, 2 G. & D. 617 ; *Holt* v. *Queen*, 2 D. & L. 774; *Christian* v. *Com.* 5 Met. 530 ; *Howell* v. *State*, 1 Oregon, 241 ; *Ratzky* v. *People*, 29 N. Y. 124 ; *Elliott* v. *People*, 13 Mich. 365; *Wilson* v. *People*, 24 Mich. 410.    And thus the law stood in this State until the enactment of the Revised Statutes of 1838.    *Stewart* v. *State*, 13 Ark. 745-8.    Among the provisions regulating the proceedings on appeals and writs of error in criminal cases are sections 224 and 225 of chapter 45 of those statutes, which are as follows :    " If the Supreme Court shall affirm the judgment of the circuit court, the sentence pronounced by such court shall be directed to be carried into execution, and the same shall be executed accordingly.    If the judgment of the circuit court be reversed, the Supreme Court shall direct a new trial, or that the defendant be absolutely discharged, according to the circumstances of the case."

After a long and diligent search, I have failed to find any statute inconsistent with or repealing either of these two sections.    Section one of the Code of Practice in Criminal Cases provides ·    " That the provisions of

this Code shall regulate proceedings in all prosecutions, and penal actions in all the courts of this State, and be known as the Code of Practice in Criminal Cases." But its repealing section only repeals all laws inconsistent with its provisions (sec. 412). In this respect it is unlike the Code of Practice in Civil Cases. The repealing section of the latter provides: "All statutes and laws heretofore in full force in this State *in any case provided for by this code*, or inconsistent with its provisions, are hereby repealed and abrogated" (sec. 857). I have not been able to find any provision in the criminal code inconsistent with sections 224 and 225; nor is there anything in the code which expressly directs what the Supreme Court shall do when a judgment against a prisoner is reversed. There are sections which impliedly say that a new trial may be granted, but further than this there is nothing. There is certainly no provision in it giving additional power to the Supreme Court in that respect.

Section 1313 of Mansfield's Digest, which is section 1103 of Gantt's Digest, provides: "The Supreme Court may reverse, affirm or modify the judgment or order appealed from in whole or in part, and as to any or all of the parties." That section is a part of section 16 of the civil code of practice as amended in 1871, which, in part, is as follows: "The Supreme Court may reverse, affirm or modify the judgment or order appealed from, in whole or in part, and as to any or all of the parties; and its judgment shall be remitted to the court below, to be enforced according to law. * * * The provisions of this section shall extend to all appeals from decrees and decisions in chancery cases, in all respects, the same as from judgments and decisions in suits at law." Acts of 1871, p. 226. It is obvious that the judgments and orders referred to in this section are judgments and orders in chancery cases and suits at law. As a crimi-

nal prosecution is neither a chancery case nor a suit at law, it can have no application to appeals in criminal cases, and does not repeal sections 224 and 225 of the Revised Statutes of 1838.

Can it be truly said that this court can do what the circuit court was authorized to do when the verdict of the jury was returned in this case and the appellant filed his motion for a new trial, and that the circuit court had a right to render a judgment of confinement in the penitentiary for murder in the second degree upon a verdict for murder in the first degree, by authority of sections 2308–11 of Mansfield's Digest, and that therefore this court can do so ? If this be true, it must derive its authority, through the circuit court, from the same source. How this can be is difficult to conceive ; for sections 2308–2311 of Mansfield's digest are sections 176–179 of chapter 45 of the Revised Statutes, and are a part of the same chapter of which sections 224 and 225 cited above form a part. It is clear that if this chapter conferred on the circuit court the power to render the judgment of confinement, it withheld such authority from the Supreme Court.

But these sections of Mansfield's Digest do not confer such power on circuit courts in cases like this. Section 2283 of Mansfield's Digest limits the right of the jury to assess the punishment, when they find a verdict of conviction, to cases wherein there is an alternative or discretion in regard to the kind or extent of the punishment to be inflicted. In no case where the kind and extent are fixed by law are they authorized to assess the punishment. In cases wherein they have the right to declare the punishment, it is the duty of the court to render judgment according to the verdict, except as provided in sections 2308–11 of Mansfield's Digest. The first of these sections provides : '' When a jury find a verdict of guilty and fail to agree on the punishment to be in-

flicted, or do not declare such punishment in their verdict, or if they assess a punishment not authorized by law, and in all cases of judgment on confession, the court shall assess and declare the punishment and render judgment accordingly." Obviously this section has no reference to cases in which the jury have no right to declare the punishment, as in this case. The other sections (2309–11) only apply to cases in which the jury assess a punishment greater than the highest or below the lowest limit prescribed by law for the offense of which the defendant is convicted by the verdict of the jury, or, if in the opinion of the court the conviction is proper, the extent or duration of the punishment assessed by the jury is excessive. In all these cases the power of the circuit court to reduce or increase the punishment is confined to the limits prescribed by law for the punishment of the offense of which the jury has found the defendant guilty. So it is clear that the circuit court had no authority by virtue of these sections to say that the punishment of a defendant found guilty by a jury of murder in the first degree shall be any other or less than death, the only penalty prescribed by law for that offense.

According to the statutes of this State, the circuit court has no power to find the degree of crime of which a defendant convicted for murder is guilty. If the accused in such cases confess his guilt, the statutes provide that the court shall impanel a jury and examine testimony, and the degree of crime shall be found by such jury (Mansfield's Digest, sec. 2284). So it is manifest that the statute intends that no one accused of murder shall be punished except for the degree of crime of which he shall be found guilty by a jury, unless it be in cases in which the degree is specified in the confession. How does he lose that right, or the verdict of a jury become less potent, by an appeal to this court?

Section 2284 of Mansfield's Digest provides : "The jury shall, in all cases of murder, on conviction of the accused, find by their verdict whether he be guilty of murder in the first or second degree ; but if the accused confess his guilt, the court shall impanel a jury and examine the testimony, and the *degree of crime* shall be found by such jury." In *Thompson* v. *State*, 26 Ark. 323 ; *Allen* v. *State*, *ib.* 333 ; *Trammell* v. *State*, *ib.* 534, and *Neville* v. *State*, *ib.* 614, the defendants were indicted for murder, and found by a jury guilty as charged in the indictment. This court, following the statute, held that the verdicts were so fatally defective that no judgment could be entered upon them, because the degree of murder of which they found the defendants guilty was not stated in the verdicts ; and remanded the causes for a new trial. If the judgment of this court in this case be correct, the court in the cases cited could have reversed the judgment, and remanded the records to the court below with instructions to impose on the defendants the penalty of murder in the second degree, because the juries, if they found the defendants guilty of either degree of murder, necessarily found them guilty of murder in the second degree. But this court did not think so, but properly remanded the causes for a new trial.

In the cases of *McPherson* v. *State*, 29 Ark. 225, *Winkler* v. *State*, 32 Ark. 552, *Brown* v. *State*, 34 Ark. 232, and *Fagg* v. *State*, 50 Ark. 506, verdicts of manslaughter were returned without the degree of the offense, of which the defendants were found guilty, being specified. In the first two cases the verdict fixed the punishment above the maximum for involuntary manslaughter and within the limits prescribed for voluntary manslaughter ; and this court held that the penalty fixed clearly indicated the purpose to convict of voluntary manslaughter, and approved and sustained a sentence for voluntary manslaughter, following the statute which

says that "where the punishment is the same in kind, the amount that may be inflicted fixes the degree." Mansfield's Digest, sec. 2289.

In Brown's case, which is cited in the opinion of the court to sustain its judgment, the circuit court instructed the jury that if they found the defendant guilty of manslaughter, they should "assess his punishment in the penitentiary for a period of not less than two nor more than seven years," the penalty prescribed for voluntary manslaughter. It did not appear in the bill of exceptions in the case that the court informed the jury what punishment the statute prescribed for involuntary manslaughter. The jury returned a verdict for manslaughter, but did not indicate the degree, otherwise than by fixing the imprisonment for a longer period than is allowed by the statute for involuntary manslaughter. After reviewing the McPherson and Winkler cases, the court said: "Possibly, however, the jury may not have known, or been informed, that they might find the prisoner guilty of manslaughter, and fix his punishment at imprisonment in the penitentiary for one year or less, and whilst we are not willing to reverse the judgment and remand the case for a new trial, we will give him the benefit of a doubt, and modify the judgment of the court below so as to reduce his imprisonment to one year from the date of his conviction, under section 1103 of Gantt's Digest." The court was unwilling to reverse the judgment and remand the case for a new trial, but gave the defendant the benefit of a doubt. What doubt? Evidently a doubt as to whether the jury found the defendant guilty of voluntary or involuntary manslaughter. They gave him the benefit of the doubt, and fixed his punishment at one year in the penitentiary, the highest penalty for involuntary manslaughter, basing its judgment on the verdict as it found it to be by giving the defendant the benefit of a doubt.

In Fagg's case the jury found the defendant guilty of manslaughter, but did not designate the degree or assess the punishment. But the circuit court fixed the punishment at three, years and six months imprisonment in the penitentiary, and rendered judgment accordingly. This court found that the jury intended a conviction of voluntary manslaughter, and affirmed the judgment.

In all these cases, in which the defendants were found guilty of manslaughter and the degree was not specified in the verdict, this court ascertained what the verdict of the jury was intended to be, and, when they refused to reverse and remand for a new trial, rendered judgment accordingly ; and in the cases in which the verdicts were for murder, without specifying the degree, reversed and remanded for reasons already stated. But in this case this court has set aside the verdict of the jury and reversed the judgment of the circuit court ; and, in effect, has tried the case *de novo* and found the defendant guilty of murder in the second degree, and remanded the cause to the court below to register its verdict and render judgment accordingly. Can it be said that such a judgment is based upon the verdict of the jury? The verdict was that the defendant was guilty of murder in the first degree. When it was set aside, there was no verdict, and the findings of fact by this court were substituted for it. When it was set aside, the inquiry necessarily was, not what had the jury found, but of what degree of unlawful homicide was the defendant guilty, if any ; and we found that it was murder in the second degree ; and that is said to have been included in the verdict, and so was an assault and battery, but the verdict was not for that offense.

My conclusion is that sections 224 and 225 of chapter 45 of the Revised Statutes of 1838 are still in force ; and that the judgment of the circuit court should be reversed, and the cause remanded for a new trial.

NOTE.—In *State* v. *Freidrich*, 4 Wash. 204, decided April 30, 1892, on a trial for murder where the prosecution merely proved that defendant did the shooting and fled with the design of escaping, but failed to show any motive, plan or deliberation, and defendant showed that he and deceased were fast friends, and on the best of terms during the day of shooting, it was held that the Supreme Court was justified in modifying a judgment of death for murder in the first degree and ordering an entry of judgment for murder in the second degree, under Code Proc., sec. 1429, authorizing that court to affirm, reverse or modify any judgment appealed from, and to direct the proper judgment to be entered. See, however, In re *Freidrich*, 51 Fed. Rep. 747. (Rep).