**STATE of Maine**

**v.**

**Richard DAY and Robert Day.**

Supreme Judicial Court of Maine.

July 14, 1972.

**332**

———◆———

Alan C. Pease, County Atty., Wisdasset, for plaintiff.

Samuel G. Cohen, Waldoboro, for Richard Day.

Richard W. Elliott, Boothbay Harbor, for Robert Day.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEBBER, Justice.

In these two cases tried together the defendants were convicted of grand larceny. The evidence disclosed that they were observed forcibly removing copper lightning rod cable from a dwelling house and shortly after were apprehended with a quantity of such cable in their truck. This conviction is before us on appeal.

■ It is first contended that since the State has failed to show any lapse of time between the severance of the cable from the realty to which it was affixed and the asportation thereof from the owner's premises, no larceny has been shown but at most a trespass. Our larceny statute, 17 M.R.S.A., Sec. 2101, in pertinent part provides:

"Whoever steals, takes and carries away, of the property of another, * * *

goods or chattels, * * * is guilty of larceny; * * *."

The defendants contend that the statute does not make realty the subject of larceny and the common law rule with respect thereto must govern. It is interesting to note that in 150 years this issue has not been raised or decided and that with respect to the interpretation to be given to the statute in this regard, the case is one of novel impression in this jurisdiction.

The common law rule was fairly stated in the text found in 50 Am.Jur.2d 242, Sec. 72 in these terms:

"At early common law, realty or anything adhering to or savoring thereof was not a subject of larceny. It was essential to the nature of larceny that the goods taken possess the quality of mobility. Because of the permanent and stable nature of land, it could not be feloniously taken and carried away; therefore, it was not larceny to steal anything adhering to the soil, or annexed thereto so as to partake of the character thereof, and not previously severed therefrom * * *."

In Sec. 73 we find:

"The application of the common-law rule to cases where the severance and the unlawful taking are accomplished by the same person is frequently difficult, and guilt of larceny 'has often been made to depend on nice and extremely technical distinctions wholly unrelated to the inherently culpable conduct of the thief. In jurisdictions following the rule, if there is a severance, and the severing and carrying away is by one continuous act, the wrong amounts merely to a trespass, on the theory that there is no interval of time between the severance and the carrying away during which the thing taken can be said to be in the actual or constructive possession of the owner in its new character as personalty. But where the severing and carrying away constitute two transactions, this objection does

not apply, and the object severed may become a subject of larceny."

Since the theft of personal property severed from real estate is ordinarily done in great secrecy and in most cases it would be impossible for the State to prove that severance and asportation were not one continuous act, one is led to wonder how a rule so patently beneficial to thieves would have been evolved in the early common law. It may well be that the answer is accurately suggested in Bishop's Criminal Law, 9th Ed., Vol. 2, P. 584, Sec. 760 wherein we find:

> "The horribly severe punishment (death) meted out for this offense in earlier times has also been influential in inducing courts to refine and limit the crime. This process frequently enabled them, in cases which they deemed to be meritorious, to avoid the necessity of pronouncing the death penalty. The subject of larceny therefore is the best illustration of the old saying that hard cases make bad law."

In this country from earliest days courts were critical of the fiction which required at least a momentary break in time and action between severance from realty and subsequent asportation. In a number of states the problem was rectified by statute. Even in those few jurisdictions in which the courts felt constrained to adhere to the common law concept, they did so reluctantly and critically. Still other courts refused to be bound by the common law concept and in the mid 19th century there had grown up what was even then referred to as the modern and enlightened rule that if property be severed from realty by a thief in such form as then to have identifiable status and value as personal property and if it then be feloniously taken and carried away by the thief, even though severance and asportation involve one unbroken and continuous act, the thief is guilty of larceny. Support for this rule is found, either in holding or dictum, in such cases as State v. Donahue (1914) 75 Or. 409, 144 P. 755;[1] State v. Wolf (1907) 22 Del. 323, 66 A. 739; Junod v. State (1905) 73 Neb. 208, 102 N.W. 462;[2] Smith v. Commonwealth (1878) 77 Ky. 31; Harberger v. State (1878) 4 Tex.App. 26, 30 Am.Rep. 157.[3]

We are satisfied that the early criticisms of the common law rule were fully justified. In a modern mobile society in which the attachment of all manner of valuable appliances and gadgets to the realty is commonplace, we see no occasion to attribute to the Legislature any intention to so narrowly circumscribe the meaning of the words "goods or chattels" in our larceny statute as to make the stealing of chattels severed from realty an attractive and lucrative occupation. We accordingly hold in the instant case that the proof of larceny was not fatally deficient merely because the severance and asportation of the lightning rod cable may, for want of proof to the contrary, have constituted one continuous and unbroken act by the defendants.

The second issue raised by the defendants relates to the value of the cable in their hands. In effect the defendants contend that even if they were proven guilty of larceny, they were not proven guilty of grand larceny, a felony, which under our statute then required that the stolen property have a value exceeding $100. When on April 1, 1970 the defendants were apprehended very shortly after their removal of the cable, there was found

---

1. In *Donahue* the Court said that the application of the common law doctrine "at times is so subtle as to require much mental gymnastics."

2. In *Junod* with respect to the fictional requirements of the common law rule, the Court said, "These fine technical distinctions and absurd sophistries are repugnant to our conceptions of justice, and the courts of most states have discarded them * * *."

3. The *Harberger* Court said, "This rule involved many technical niceties which have resulted in what appear to us to be pure absurdities."

in their truck approximately 274 feet of cable. The State at the outset proceeded on the theory that all of this cable had come from the house and barn on the owner's premises. There was in fact testimony given by the owner that there was cable on both house and barn that day. When later a witness was offered by the defendants who had had opportunity as a caretaker to have familiarity with the premises for a much longer time than the present owner, and when this witness stated that all cable had been removed from the barn many years before and cable remained only on the house, the State evidently concluded that the knowledge and observation of the defense witness were accurate and trustworthy and should be accepted. Accordingly, the State conceded both to the Court and in argument to the jury that not more than 150 feet of cable had been taken, and this from the house. This meant that the jury must find on the basis of probative evidence that the 150 feet of cable had a value of at least 67 cents per foot in order to establish a value in excess of $100. At trial the defendants took the position that the cable had only junk value as copper which was shown to be 48 cents a pound or from 16 to 24 cents per foot. The Justice below properly declined to permit the defendants to have the benefit of the junk price if by their wrongful act they had destroyed the value of cable for its proper use as cable and transformed it into junk. On appeal, however, defendants have abandoned their claim with respect to value as junk and now assert with considerably greater persuasiveness that the State has shown no value of the cable as used cable in excess of 45 to 55 cents per foot, a range inadequate to prove the felony.

The evidence discloses that there is only a very limited market for lightning rod cable for use as cable since it can only be purchased and installed by licensed persons who constitute the entire market. Nevertheless, as the evidence shows, there is an identifiable market and a basis for establishing the fair market value of used cable. Two licensed installers gave testimony.

Mr. Parlin indicated that he buys used cable on occasion but only when he has a prospect for a lightning rod installation in which he could use such cable. He indicated that he would have been willing to pay 50 cents per foot for the cable involved in this case if he had had a prospective customer. He also stated that new cable costs him 55 cents per foot and he sells it to the customer for $1.50 per foot including labor and other installation costs. Mr. King actually arranged with the owner to purchase this used cable from her at a price of 45 cents per foot. It is apparent that he also performs used cable installations and was purchasing this used cable for that purpose since the 45 cent price is substantially more than the junk price. He also pays 55 cents for new cable but his price for the installation of new cable is $1.50 per foot exclusive of labor and other costs. Neither witness was ever asked and therefore never stated what price they would charge per foot for *used* cable which they might install and which was in the same or similar condition as the used cable in this case. The evidence is thus left in the posture of disclosing a conglomerate of prices which significantly fail to demonstrate a fair market value of *this* cable at the moment of severance equal to or in excess of the requisite 67 cents per foot. More specifically we have:

1. 16 to 24 cents — junk price not applicable
2. 45 cents — wholesale price actually paid for this cable
3. 50 cents — estimated wholesale price for this cable
4. 55 cents — wholesale price for new cable
5. $1.50 — installed retail price for new cable but including undetermined amount for labor
6. $1.50 — installed retail price for new cable exclusive of labor.

It is universally held that where the value of the stolen property is in issue in a larceny trial, the rules which establish value in civil cases (apart from burden of proof) are applicable. When it can be shown that there is no ascertainable market value, resort may be had to other factors rationally related to value such as replace-

ment cost. We have found no better summation of the applicable law than is contained in an annotation in 12 A.L.R.2d 902. Therein it is stated (at page 927), "In considering cost of replacement as an element of, or as the sole measure of, damages for injury to or loss [4] of personal property having no market value, it has been held that the depreciation of the original property should be deducted from the total cost of reproduction *new*." (Emphasis ours). We adopt this text as an accurate statement of the law. Under the ordinary rules of the market place, even when personal property has not physically deteriorated or lost its capacity to render the service for which it was designed, there is ordinarily applicable a *market* depreciation which prevents *used* property from commanding as high a price as *new* property. Even assuming arguendo that it had been adequately demonstrated that there was no ascertainable market value for this used cable and resort might properly be had to replacement value, there is in the instant case no showing as to the replacement cost of *used* cable, no evidence as to the depreciation factor to be applied to the replacement cost of *new* cable and, finally, no proof that there are present extraordinary circumstances which make the replacement cost of new and used cable identical and thus eliminate the necessity of depreciating the replacement cost of new cable. The retail price of new cable and the retail price of used cable may well be as unlike as pears and oranges. The jury cannot be permitted to conjecture as to value and by guess arrive at a figure outside the permissible range afforded by the testimony. We are compelled to conclude that the State has failed to prove beyond a reasonable doubt that the value of the stolen property exceeded $100 and the appeal from a conviction of grand larceny must be sustained.

Since, therefore, this case must be tried anew, we need comment only briefly upon other points raised by defendants.

The defendants elected not to testify in their own behalf. The Justice below, at the request of the defendants, instructed the jury upon the effect of this election. He prefaced these remarks with a brief history of the development of the law from the time that a defendant in a criminal case was deemed incompetent to testify in his own behalf. He ended with an unqualified instruction that failure of the defendants to testify was not to be considered as any evidence against them and that the jury was not to draw any inferences against them because of that failure. This instruction did not suffer from the infirmity noted in State v. Shannon (1938) 135 Me. 325, 196 A. 636 in which the charge to the jury suggested that a defendant in making his election was "protected to some extent." While conceding that the unqualified admonition to the jury in the instant case was an accurate statement of the law, defendants contend that the gratuitous exposition of the historical background constituted prejudicial error. It is not claimed that this portion of the charge was historically inaccurate. While we question whether any useful purpose is served by giving the jury more than an unequivocal statement of the absolute right of the defendant to his election and the consequences which flow from such election, we cannot agree that the historical elaboration given in this case constituted reversible error.

Immediately following jury verdict finding defendants guilty of grand larceny, proceedings were begun upon an indictment charging the defendants with being common thieves pursuant to 17 M.R.S.A., Sec. 2112. Reserving their rights to challenge the applicability of the statute to the particular circumstances, the defendants admitted by plea that they had, as alleged, been convicted earlier of petty larceny. It is now agreed that they were denied the assistance of counsel at the time of the prior conviction. At a time subsequent to

4. Although the text as worded is applicable to civil actions, the rule is equally applicable to criminal cases if we but substi-
tute for the words "damages for injury to or loss of" the words "value of stolen."

this trial we decided Newell v. State of Maine et al. (1971–Me.) 277 A.2d 731 in effect applying the constitutional right to the assistance of counsel to "serious" misdemeanors. Petty larceny as of July 13, 1964, the date of the prior conviction, was a "serious" misdemeanor under the Newell definition. The Newell rule has retroactive application and taints the 1964 conviction. The State, recognizing this fact, has conceded upon this appeal that the conviction under 17 M.R.S.A., Sec. 2112 must be set aside in any event.

■ Although the issue was not raised or argued by either party, we have given careful consideration to the authority of the Law Court to change the judgment in a criminal case. Stated more precisely, when the evidence is legally insufficient to support a jury verdict of guilty of grand larceny but would have supported one for petty larceny, should the Law Court order a new trial or merely remand for new sentence?

The question is one of novel impression in this jurisdiction. There is a conflict of authority in the case law of other states.[5] Some courts have assumed inherent power to modify the conviction. Simpson v. State (1892) 56 Ark. 8, 19 S.W. 99; Daniels v. State (1944) 196 Miss. 328, 17 So.2d 793; Corlew v. State (1944) 181 Tenn. 220, 180 S.W.2d 900. Others have relied upon authority expressly conferred by statute. People v. Kelley (1929) 208 Cal. 387, 281 P. 609; Porter v. State (1968–Del.) 243 A.2d 699; Bornstein v. State (1951–Fla.) 54 So.2d 519; State v. Sprouse (1941) 63 Idaho 166, 118 P.2d 378; Ritchie v. State (1963) 243 Ind. 614, 189 N.E.2d 575; Commonwealth v. Baker (1963) 346 Mass. 107, 190 N.E.2d 555; State v. Gunn (1931) 89 Mont. 453, 300 P. 212; See People v. Bonsignore (1964) 21 A.D.2d 309, 250 N.Y. S.2d 345; See Commonwealth v. Sterling (1934) 314 Pa. 76, 170 A. 258; and State v. Sorrentino (1934) 31 Wyo. 129, 224 P. 420.

There is no statutory authority in Maine for modification of a conviction by jury verdict in a criminal case to conform to the evidence.

We find persuasive the reasoning of the Iowa Court in State v. O'Donnell (1916) 176 Iowa 337, 157 N.W. 870. That Court construed its power as being limited to the correction of errors of law. It noted that modification would tend to deny the defendant his right to trial by jury by limiting him to one trial by a jury which reached an erroneous result on the evidence presented. The Court pointed out that the evidence may not be the same upon a new trial and a jury correctly evaluating the evidence presented might properly acquit. In any event we decline in the absence of statutory authority to assert an inherent power which finds only dubious support in the authorities.

The entry will be

Appeal sustained. Remanded for new trial on the indictment for larceny.

All Justices concurring except WEATHERBEE, J., concurring and dissenting in part.

WEATHERBEE, Justice (concurring and dissenting in part).

I dissent only from the order of remand for new trial. The Defendants have been properly convicted of the crime of Larceny. There is only one crime of Larceny and the terminologies of "petty" and "grand" only describe the degree of the crime. State v. Thomes, 126 Me. 163, 136 A. 726 (1927). While the property stolen must be of *some* value (State v. Pelkey, Me., 238 A.2d 611 (1968)), value is in no other respect an element of the crime. At the time of Defendants' trial the law's only other concern with value was whether it was or was not in excess of $100 in order to deter-

5. Reference may be had to the authorities assembled in 5 Am.Jur.2d 365, Sec. 938 (Appeal & Error) and in 24B C.J.S. Criminal Law § 1946, p. 311.

mine the limits of punishment. Therefore, it seems to me that the jury verdict of Guilty of Grand Larceny was, in fact, a finding of Guilty of Larceny with a special finding that the value was over $100.

There was no error in the jury's determination that the Defendants were Guilty of Larceny but the jury erroneously found that the State had proved a value in excess of $100.

The jury has properly found the Defendants' guilt of Larceny and I do not feel that the State should be required to prove their guilt a second time. Similarly, the State has had its chance to prove that the value was in excess of $100 and has failed and I do not feel that the State should be entitled to a second opportunity to prove this.

I would remand for re-sentence only.