**STATE of Maine**

v.

**Dale L. THIBEAULT.**

Supreme Judicial Court of Maine.

Aug. 31, 1978.

David M. Cox, Dist. Atty., Gary F. Thorne (orally), John A. Woodcock, Jr., Asst. Dist. Attys., Bangor, for plaintiff.

Ford & Hall by Eugene W. Ford, III, Bangor (orally), for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

McKUSICK, Chief Justice.

Appellant Thibeault was indicted for receiving stolen property in violation of 17–A

M.R.S.A. § 359 (Supp.1977).[1] A Penobscot County jury found him guilty of receiving stolen property with a value in excess of $500, a Class D crime. We deny his appeal from the resulting judgment of conviction.

On the morning of May 26, 1976, the Bangor police department received an anonymous phone call informing them that stolen property was being moved into the residence of the defendant, Dale Thibeault, at 26 Market Street in Bangor. Officer Joseph Ferland drove to Thibeault's residence sometime shortly after noon on May 26 and knocked on the door. Mr. Thibeault answered the door. The officer informed Thibeault that he had received information that some furniture that was moved into Thibeault's house that morning was stolen. Thibeault voluntarily consented to the officer's inspection of the furniture, assisted him in obtaining a serial number from a TV set, and answered his questions concerning the origin of the furniture.

Mr. Thibeault told Officer Ferland that he had purchased the furniture from "Billy, I mean Charlie or Chuck O'Connors." Thibeault said he had paid $350 for the furniture but that he did not have a receipt. He also said that O'Connors lived on York Street and that the furniture was delivered in a green van. The police officer left Thibeault's residence and drove to York Street, where he tried unsuccessfully to locate an O'Connors or a green van.

On the following day Mrs. Charlene Gray of Lucerne, Maine, reported to the Bangor police that her home had been burglarized and some of her furniture stolen. With this information in mind, Officer Ferland returned to the Thibeault residence on the 27th. No one was home when he arrived shortly after noon. He observed the furniture through a window and concluded that it matched the description of the missing furniture given by Mrs. Gray. The Thibeault residence was placed under surveillance. At 10:30 p. m. Dale Thibeault was arrested when he returned home. He was taken to the Bangor police station where, after being advised of his *Miranda* rights, he made some incriminating but arguably ambiguous statements concerning his knowledge that the furniture was stolen.[2] There was conflicting evidence at trial as to when Mr. Thibeault gained knowledge that the furniture was stolen. His counsel contended that he did not acquire this knowledge until after Officer Ferland visited his home on the 26th and that therefore the incriminating statements referred to knowledge gained only as of that time.

Given the testimony of the defendant's wife, Catherine Thibeault, the jury could have found that the furniture was first offered to the Thibeaults by a Bill Randall and a Charles O'Connell early on the morning of the 26th. Mrs. Thibeault testified that her husband objected to the price of $350 requested by O'Connell. She told O'Connell she would have to see the furniture first, and she then drove to O'Connell's place on York Street to inspect it. Apparently liking what she saw, she told him that

---

1. The statute provides:

    "1. A person is guilty of theft, if he receives, retains or disposes of the property of another knowing that it has been stolen, or believing that it has probably been stolen, with the intention to deprive the owner thereof.

    "2. As used in this section, 'receives' means acquiring possession, control or title, or lending on the security of the property. For purposes of this section, property is 'stolen' if it was obtained or unauthorized control was exercised over it in violation of this chapter."

2. Testimony of Lieut. Frederick E. Clarke, Bangor Police Department:

"Q. What did Mr. Thibeault tell you relative to the particular furniture that other officers had taken from *his apartment?*

"A. He asked me what I wanted to know. And I told him I wanted to know how he came in possession of the furniture. He stated that he knew the furniture was stolen; I knew the furniture was stolen, *referring to me;* and that he knew who stole it; and that I knew who stole it. But he was not going to give me a statement.

"Q. Did you continue to question him?

"A. Yes, sir.

"Q. What was your next question?

"A. I asked him did Bill Randall bring the furniture to his house. He stated, 'I'm not going to answer that. I cannot tell you that. He'll *kill me.'* "

he could bring the furniture to her apartment and she would go to the bank to see about a loan. She obtained a loan from the Merrill bank between 10 and 11 a. m. that morning and took the money with her to the restaurant where she worked. O'Connell was paid at 4 p. m. that afternoon when he came to collect the money.

On his appeal, defendant claims reversible error was committed in each of four respects: (1) that his constitutional right to trial before an impartial jury was impaired by juror knowledge of his previous status as a patient in a mental hospital; (2) that the trial justice erroneously instructed the jury as to the elements of the crime of receiving stolen property; (3) that there was insufficient evidence to support the finding that the recovered stolen property was worth more than $500; and (4) that a photograph, which did not accurately portray the recovered stolen property, was erroneously admitted into evidence.

We now proceed to consider each of these contentions in order.

## I. Challenge to the Jury

Before trial the veniremen were questioned as a group concerning their acquaintance with the defendant. Three members of the panel said they had seen the defendant at the Bangor Mental Health Institute (BMHI). The trial justice wisely recognized that continued questioning of these three in the presence of the entire panel might lead to a general airing of prejudicial information. He refused to grant a defense motion to strike the entire panel and instead conducted further voir dire separately of each of the three individuals who had identified the defendant with BMHI.

One potential juror, Mrs. Sanders, who worked at the BMHI, said she had never talked with the defendant, did not know him, and was not aware of what his psychiatric condition was. The entire extent of her knowledge of the defendant, she said, was that she had seen him at the Institute. She testified she would not be influenced in any way in reaching an impartial verdict.

Defense counsel moved to excuse Mrs. Sanders for cause and the prosecution objected. The court denied the motion, noting that "The mere fact that she is an employee of the Bangor Mental Health Institute, would not in and of itself disqualify her unless it could be connected with the Defendant."

The other two veniremen questioned indicated that although they knew nothing of the defendant's mental condition, they were personally acquainted with him, and they preferred not to sit on the jury. Both were excused for cause.

All three veniremen were questioned as to whether they had discussed the defendant's hospitalization with other members of the jury panel. One indicated she had made a remark, overheard by Mrs. Bartlett, that she did not expect to end up sitting on the jury. Mrs. Bartlett was then questioned, and she answered that this comment in no way affected her ability to render an impartial verdict. A defense motion to excuse Mrs. Bartlett for cause was denied.

The trial justice conducted further questioning of all the prospective jurors. Five indicated they had inferred that the defendant had been at one time a patient at BMHI. All, however, said they were in no way affected by this knowledge. Defense counsel renewed his motion to strike the entire panel, but the motion was again denied. The jury was impaneled. The defendant used all his peremptory challenges, but two persons who had admitted they believed the defendant was a former BMHI patient were seated on the jury.

On appeal defendant argues that he was entitled to have a trial jury composed of persons who did not know of his status as a former patient at BMHI. He argues this knowledge was *per se* prejudicial, regardless of the fact that the jurors testified it did not influence them, and that consequently his constitutional right to an impartial jury was violated. The right to an impartial jury is guaranteed all criminal defendants by the Sixth Amendment of the United States Constitution and by Article I, section 6 of our own Constitution of Maine.

*Christian v. State,* Me., 268 A.2d 620, 623 (1970). In the alternative, defendant Thibeault maintains that the trial court abused its discretion in refusing to grant his challenges for cause with respect to the jurors who admitted they believed Thibeault had once been in a mental hospital.

■ Whether a fact brought out on voir dire requires a new trial depends on whether the fact has "such high potential for ineradicable prejudicial impact upon those who ultimately become jurors as to deny to the defendant a fundamentally fair trial." *State v. Gordon,* Me., 321 A.2d 352, 368 (1974). We cannot accept the view that the mere fact that a defendant has undergone treatment at a mental hospital will always have such an ineradicable prejudicial impact.[3]

■ We recognize that when jurors learn that a defendant has been previously arrested or convicted of a criminal offense, notwithstanding their assertions that they can still be impartial, justice requires that these jurors be excused if evidence of the prior conviction would not be admissible at trial. *See Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). But this case does not involve knowledge of a defendant's prior criminal record or anything that rises to a comparable level of inherent prejudice. There is no direct nexus between mental hospitalization and alleged criminal activity that parallels the relationship between a past conviction and a current criminal accusation.

■ The jurors in this case, at most, knew only that the defendant had once been in a mental hospital. They were not familiar with his treatment, diagnosis, or with his psychiatric problem which required hospitalization. Our holding today is confined to the narrow set of facts before us. We are unable to discern even the most tenuous link between mere mental patient status and the offense of receiving stolen property.

3. *Cf. State v. Goldman,* Me., 281 A.2d 8 (1971) (questions concerning prior metal patient status proper, but questions concerning electrical

A century ago the United States Supreme Court said of juror challenges for cause:

"The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside . . . ." *Reynolds v. United States,* 98 U.S. 145, 157, 25 L.Ed. 244 (1878), quoted with approval in *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

The determination of existence of prejudice is for the trial court to make. " 'The finding of the trial court upon that issue . . ought not be set aside by a reviewing court, unless the error is manifest'." *Id.* at 723, 81 S.Ct. at 1643.

Very recently, in a case involving a mistrial granted due to defense counsel's improper remarks to the jury, the United States Supreme Court observed:

"There are compelling institutional consideration militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias. He has seen and heard the jurors during their voir dire examination. He is the judge most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more 'conversant with the factors relevant to the determination' that any reviewing court can possibly be." *Arizona v. Washington,* 434 U.S. 497, 513, 98 S.Ct. 824, 834, 54 L.Ed.2d 717, 733 (1978).

In the instant case the trial justice undertook a painstaking and conscientious examination of the veniremen in a search for any prejudicial effect and in fact excused two veniremen for cause. We must "accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have

shock treatment improper where no medical testimony offered to show relevance).

been affected." *Id.* 434 U.S. at 511, 98 S.Ct. at 833, 54 L.Ed.2d at 732. Another trial justice might well have concluded that the safer course was to dismiss the entire panel. But we cannot hold that the failure to do so was an abuse of discretion. Given the exhaustive voir dire inquiry conducted by the trial court, we are confident that the defendant's right to a fair and impartial jury was fully respected.

## II. *Jury Instructions*

██ On appeal defendant contends that the jury could have found the defendant did not acquire a belief that the property had probably been stolen until the police officer's visit to his home about noon on May 26, and then might have gone on to convict the defendant merely for continuing to possess the furniture until the police removed it late the following day. The defendant argues that under those circumstances he could not be convicted unless subsequent to the police visit the jury found he took further action, or permitted further action to be taken, to exercise additional dominion over the property. The defendant appropriately preserved this point for appeal by requesting a jury instruction and by objecting to the instruction and reinstruction as given.

Although the trial justice's first set of instructions was somewhat confusing on this point, he gave a further instruction to the jury upon defense counsel's request. The justice instructed the jury in terms of the statute, reading to the jury the statutory definition of "receiving" to include "acquiring . . . title." 17–A M.R.S.A. § 359(2) (Supp.1977). In his second set of instructions, which he specifically directed to the possibility that the jury would find the defendant acquired his belief that the property was probably stolen only from what the police officer told him, the justice charged the jury: "From there [that is, after the police visit] you may also consider what else the Defendant may have done . . . which would be considered to be receiving in the context of the definition of receiving, meaning to acquire, to control, or

to acquire title, or buy, purchase." The trial justice also stated to the jury: "Subsequent thereto [that is, to the police visit] . . . did he or did he not exercise or do things within the meaning of the definition of receiving from which you could conclude, as fact beyond a reasonable doubt, that such action would constitute receiving." With the second set of instructions, it is clear that the jury was correctly and adequately instructed on the applicable law. With that correct and adequate instruction, there was sufficient evidence, even if the defendant did not know the property was stolen until the police visit, to justify the jury's finding, beyond a reasonable doubt, that he acquired title to the stolen property after the police visit. That acquisition of title constituted the "receiving" of stolen property proscribed by section 359.

Although we have never had occasion to adopt explicitly the rule that one cannot acquire good title from a thief, that is universally the rule in other jurisdictions. *See, e. g., Bangor Electric Light & Power v. Robinson,* 53 F. 520, 523 (Cir.Ct.Mass.1982); *Farm Bureau Mutual Auto Ins. Co. v. Moseley,* 47 Del. 256, 259, 90 A.2d 485, 487 (1951); *Schrier v. Home Indemnity Co.,* 372 A.2d 248, 250–51 (D.C.Ct.App.1971); *Pratt v. Higginson,* 230 Mass. 256, 257, 119 N.E. 661, 662 (1918); *National Retailers Ins. Co. v. Gambino,* 1 N.J.Super. 627, 64 A.2d 927, 928 (1948); *Eddie's Auto Body Works, Inc. v. Lumbermen's Mutual Casualty Co.,* 28 A.D.2d 995, 283 N.Y.S.2d 306, 307–08 (1967). Our statute, in defining "receives" in terms of acquiring title, plainly refers to those acts by which title would be acquired without regard to whether the property is stolen or not. In the case at bar, the evidence showed that subsequent to the police visit to his home, the defendant, through his wife, paid O'Connell for the furniture; he did nothing to halt the running out of the train of events by which he acquired "title" some four hours after he knew that the property probably had been stolen.

During the cross-examination of defendant's wife, the prosecution elicited the following testimony about defendant's phone conversation with his wife on the afternoon of May 26:

"Q Did he [Dale Thibeault] mention anything about the officers looking at the furniture and saying they thought it was stolen, and taking the serial number of the television set?

"A Yes, he did.

"Q And you still gave Charlie O'Connell money after that?

"A I don't remember if that was before or after I paid O'Connell.

. . . . .

"Q You went to work at 10, arrived at work at 11, right?

"A Yes.

"Q You heard the investigator say that they were at the apartment at noon?

"A Yes.

"Q And they, from the testimony, didn't stay there very long, did they?

"A I don't think so.

"Q And it wasn't until 4 o'clock that Charlie O'Connell appeared and collected the money, right?

"A Yeah, around there.

"Q And during the four-hour period, Dale never called you and said, 'Don't pay him because the furniture probably is stolen and we'll lose our money?'

"A No, he never told me that."

In view of this testimony, the trial justice correctly noted that if Thibeault first learned from the police the furniture was stolen and then decided nevertheless to allow his wife to consummate the transaction by making payment to O'Connell, Thibeault could be found guilty of the offense charged. The jury was properly instructed that if the defendant "acquired title" to the furniture subsequent to the police visit, he could be found guilty of "receiving" within the meaning of the statute.

We recognize that in the instant case, "title" may have been acquired at a point in time when the police were well aware of the property's whereabouts, and concealment of the property from the police, and therefore from the true owner, was virtually impossible. But statutes against receiving stolen property serve a dual purpose. First, they are designed to prevent persons from aiding thieves by concealing the whereabouts of stolen property. Second, these laws seek to eliminate the market for stolen goods, by proscribing the very act of entering into transactions with thieves.

In revising the criminal statute defining the offense of receiving stolen property, our legislature followed the approach recommended by the drafters of the Model Penal Code. The old statute used the words "buys, receives or aids in concealing the stolen property" to define the offense.[4] The Maine Criminal Code replaces the term "buys" by the word "receives," defined to mean "acquires possession, control or title." This accords with the drafters' observation "that the essential idea sought to be expressed is acquisition of control whether in the sense of physical dominion or of legal power to dispose."[5]

■ In construing our previous statute, we noted that the offense could be committed in three different ways, either by buying, receiving, or aiding in concealment of stolen goods. *State v. Nelson*, 29 Me. 329,

4. 17 M.R.S.A. § 3551, superseded as of May 1, 1976, by section 359 of the Criminal Code, provided in part:

"Whoever buys, receives or aids in concealing stolen property, knowing it to be stolen, shall be punished . . . ." Section 359 of the Criminal Code "retains the core of the traditional 'receiving' crime." Comment—1975 to 17- A M.R.S.A. § 359 (Supp.1977).

5. *Model Penal Code* § 206.8, Comment 2 (Tent. Draft No. 1 1953). The text of the Code's section defining the offense reads:

"(1) *In General.* A person who receives stolen movable property otherwise than for the purpose of restoring it to the owner commits theft if he knows that it is stolen property or, in the case of a dealer, if he believes that it is probably stolen property.

"(2) *Receiving Defined.* Receiving means:

(a) acquiring possession, control or title;

(b) selling or lending on the security of the property;

(c) retaining or transferring possession, control or title after the actor has information leading him to knowledge or belief, as the case may be, that the property is stolen, without notifying the police."

334 (1849). Similarly, under our new Criminal Code, it is enough that the accused acquires title to stolen goods with knowledge of their stolen character. It is not necessary that he participate in the concealment of the goods. As the Model Penal Code drafters observed, the act of purchasing or taking title to stolen goods encourages the existence of a market for stolen property. "From a practical standpoint, it is important to punish receivers in order to discourage theft. The existence and functioning of the 'fence,' a dealer who provides a market for stolen property, is an assurance especially to professional thieves of ability to realize the unlawful gain." *Model Penal Code* § 206.8, Comment (Tent.Draft No. 1, 1953).

In the instant case, the act of paying O'Connell lent encouragement and support to the future criminal ventures of the thief, whether the thief was O'Connell or someone else from whom O'Connell obtained the stolen furniture. It would convey to the thief the idea that Thibeault is an available customer, one interested in cheap stolen goods, a buyer not afraid to shoulder the risks which accompany the purchase of stolen merchandise.

Ordinarily the goals of combatting concealment of property from true owners and the elimination of the demand for stolen goods go hand in hand. On the particular facts of this case, assuming that the defendant first acquired knowledge of the furniture's stolen character from Officer Ferland, the statutory objective of preventing concealment of stolen property did not come into play. Yet the other statutory goal, of eliminating a market for stolen goods, was still to be served. The defendant's alleged failure to stop payment for the goods contravened this basic policy of the statute.

■ It was upon this theory of criminal liability that the trial court instructed the jury. Though the court's first set of instructions were somewhat confusing, the trial court reinstructed the jury upon defense counsel's request. We are convinced that this second set of instructions dispelled any possible juror confusion which might have led the jury to believe that mere possession of the furniture for one day, after being apprised by the police that it was stolen, could constitute a criminal act.

### III. *Value of Property*

Thibeault was convicted of receiving stolen property worth more than $500, a Class D offense. 17–A M.R.S.A. § 362(4)(B). On appeal, Thibeault contends the evidence was insufficient to support the jury's finding of a value of more than $500. We disagree.

■ The standard for the valuation of stolen property for the purpose of determining the grade of the offense of receiving stolen property is fair market value. 17–A M.R.S.A. § 352 provides in part:

"The meaning of 'value' shall be determined according to the following:

"A. Except as otherwise provided in this subsection, value means the market value of the property or services at the time and place of the crime, or if such cannot be satisfactorily ascertained, the cost of replacement of the property or services within a reasonable time after the crime."

■ Maine has long followed the rule that an owner of personalty is competent to testify to its value because of his presumed knowledge of the characteristics and peculiarities of his property, the weight to be accorded the owner's testimony being left to the jury. *State v. Doray,* Me., 359 A.2d 613, 614 (1976). We held, in *State v. Day,* Me., 293 A.2d 331 (1972), that there is ordinarily a difference between the purchase price for goods when new and the resale price for the same goods after they have been used. Thus, we set aside a grand larceny conviction where the owner's testimony failed to show that the fair market value of copper cable, at the time it was stolen, exceeded $100. "The retail price of new cable and the retail price of used cable may well be as unlike as pears and oranges. The jury cannot be permitted to conjecture as to value and by guess arrive at a figure

outside the permissible range afforded by the testimony." *Id.* at 335. Thibeault maintains that a similar error has occurred in his case and that the jury has been allowed to make a finding of value based solely on testimony of the owner as to the value of her furniture at the time she purchased it, rather than its used value as of the time it was stolen. This contention fails because Mrs. Gray's testimony did not end with the combined purchase price of all the furniture stolen from her house. Mrs. Gray also testified to her opinion of the current value of the individual pieces or sets of furniture recovered from the Thibeault residence, and simple addition of those figures totals to more than $500. For example, with reference to the recovered living room set alone, Mrs. Gray testified that she bought it for $700 new and that she estimated its used value to be $500, noting that it was only two months old when stolen. The recovered bedroom furniture, she testified, cost $800 when she bought it and was used when first purchased. The jury was informed that this set was one year old when stolen. Upon this evidence the jury could arrive at a figure for the depreciated value of the bedroom set.[6]

Defense counsel attempted to show that Mrs. Gray purposefully overestimated the value of her furniture in order to collect a reimbursement check from her homeowner's insurance company. But at most this was an argument for the jury to consider and is not appropriately pressed on appeal.

We find no evidentiary deficiency in the proof of the value of the stolen furniture.

### IV. *Admission of the Photograph*

█ The defendant's last contention is · that a picture of the furniture recovered from his apartment was not a fair and accurate representation of the furniture and therefore should not have been admitted in evidence. Even assuming that the picture was an inaccurate representation— and the defendant has not given us even the slightest reason for doubting its accuracy—we note that the photograph was used merely to illustrate critical testimony already given by three State witnesses. Officers Ferland and Clarke testified that they removed furniture from Thibeault's apartment. Mrs. Gray testified that she identified her furniture as that taken from Thibeault's residence, by going personally to the Bangor police station and identifying the furniture as hers. Her identification was not made from the photograph but was made from actual observation directly of the seized furniture itself. Thus, the photograph merely added support to the witnesses' testimony and did not take its place. It was offered to illustrate the direct testimony of State witnesses and was properly accepted into evidence for that purpose. *State v. McLain*, Me., 367 A.2d 213, 219 (1976).

In conclusion, we find no reversible error in the conviction of defendant Thibeault for receiving stolen property. Accordingly, the entry must be:

Appeal denied.

Judgment affirmed.

GODFREY, Justice, dissenting.

There was no good reason for the trial justice to refuse to grant appellant's challenges for cause to the persons on the panel who admitted they believed defendant was a former BMHI patient. We do not have to hold that the retention of those persons on

---

**6.** "It was not required that the fact of value should be established by any separate proof. The jury may infer it from an inspection of the articles or from having heard them described by witnesses. The jury need not necessarily be informed of what they can see for themselves. Many things speak their own value." *State v. Gerrish*, 78 Me. 20, 23–24 (1885); *State v. Perley*, 86 Me: 427, 433 (1894).

Unlike copper lightning rod cable, *see State v. Day, supra,* lay jurors are well acquainted with household furniture. Given the purchase price of the furniture, its age, and having access to a photograph depicting the furniture, the jury's assessment of value cannot be attacked as speculative.

the jury was a *per se* violation of the state or federal constitutions in order to conclude that this appellant was unjustly treated by leaving them there in the face of his strong, timely, and insistent protests. Appellant made known to the trial justice at an early stage of the proceedings that, because of possible prejudice, he did not want persons on the trial jury who knew of his status as a former BMHI patient.

Appellant does not have to establish that the mere fact that a defendant has undergone treatment at a mental hospital will "always" have such "high potential for ineradicable prejudicial impact" on those who ultimately become jurors as to deny him a fundamentally fair trial. There is no need to conjure with so broad a generalization in order to resolve the simple issue in this case.

The majority treats appellant's request as if it were a piece of whimsy not grounded in any reality of possible prejudice. I do not know—and neither does anyone else—whether appellant was actually prejudiced in the jury's deliberations. He certainly thought he would be, and the court is assuming too much in declaring he was not. We have no basis whatever for holding, as we do in effect, that attitudes of hostility toward persons with known mental problems have been exorcised from the populace. It is equally naive to assume that it sufficed to ask the venire-persons holding the belief that the defendant was once an inmate whether they thought they could come to a fair verdict.

On voir dire, the entire panel was exposed to information that caused six members of the panel to form the belief, which they had not held before voir dire, that appellant had been a patient at BMHI. The court denied appellant's request for individualized voir dire, with the result that the entire panel was exposed to the issue again. Nine individuals admitted to having the belief that appellant had been a patient, and, in the circumstances, others must have developed doubts on the subject. Seven of those who had admittedly formed the belief were unsuccessfully challenged for cause,

and after appellant exercised his peremptory challenges two of them remained on the trial jury. Though the seven said that their belief would not influence their decision, there remained a possibility that they might not meet their own expectations. *See Silverthorne v. United States*, 400 F.2d 627, 639 (9th Cir. 1968). Furthermore, even though the seven said they would not be influenced, there was a danger of prejudice if, during deliberations, they communicated their belief to other members of the jury who had not been examined on possible prejudice.

Any evidence to prove appellant's status as a former BMHI patient would have been inadmissible and prejudicial in his case. See Maine Rules of Evidence, Rules 401–404. He moved for a mistrial and challenged the seven panelists for cause before the State was put to the expense of a full trial. Since appellant made timely indication that he felt he would be prejudiced and the jurors' specific belief about him had a high potential for prejudicial impact, he should be given a new trial.

In these days of widespread publicity, jurors often have some exposure to cases prior to trial. When prospective jurors are exposed to such publicity, a mistrial or removal of the venireman is not always required. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Mere exposure to publicity does not necessarily lead prospective jurors to form a belief about facts in the case. They may disregard the supposed information more easily than when they have actually formed an opinion about a fact in issue or about a party's record or reputation. Even so, convictions have been reversed in such cases. In *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), the Supreme Court reversed a federal court conviction for a drug law violation where, during the trial, some of the jury read newspaper items mentioning prison terms the defendant had served a few years before. On learning that the news account had reached the jurors, the trial judge summoned them

into his chambers individually. All seven told the judge that they would not be influenced by the news items, that they could decide the case only on the evidence of record, and that they felt no prejudice against defendant as a result of the articles. The trial judge denied a motion for mistrial. Reversing and granting a new trial, the Supreme Court said, in a per curiam opinion, at page 312, 79 S.Ct. at page 1173,

"We have here the exposure of jurors to information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence. The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence. Cf. Michelson v. United States, 335 U.S. 469, 475, 69 S.Ct. 213, 218, 93 L.Ed.2d 168, [173]. It may indeed be greater for it is then not tempered by protective procedures."

When members of the panel have actually formed a belief, based on information not in evidence, about a fact at issue in a criminal trial, or about the defendant's record or reputation, a new trial should ordinarily be granted. United States v. McMann, 435 F.2d 813 (2d Cir. 1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971); Silverthorne v. United States, supra; State v. Myers, 190 Neb. 466, 209 N.W.2d 345 (1973); People v. Harris, 53 App.Div.2d 1007, 386 N.Y.S.2d 263 (1976).

In his opinion in United States v. McMann, supra, at page 818, Judge Friendly quoted as follows from Judge Goldberg's opinion in United States v. McKinney, 429 F.2d 1019, 1022–23 (5th Cir. 1970).

" 'All must recognize, of course, that a complete sanitizing of the jury room is impossible. We cannot expunge from jury deliberations the subjective opinions of jurors, their attitudinal expositions, or their philosophies. These involve the very human elements that constitute one of the strengths of our jury system, and we cannot and should not excommunicate them from jury deliberations. Nevertheless, while the jury may leaven its delib-

erations with its wisdom and experience, in doing so it must not bring extra *facts* into the jury room. In every criminal case we must endeavor to see that jurors do not [consider] in the confines of the jury room . . . specific facts about the specific defendant then on trial. . . .' "

The costs of drawing a new jury or excusing several veniremen are not large as long as relief is requested and afforded prior to trial. Knowledge of appellant's status as a former patient at BMHI posed a danger of ineradicable prejudice, and appellant should have been afforded some relief by the trial court. At the very least, the trial court should have excused those veniremen who had actually formed a belief that appellant was a former patient at BMHI. Those seven individuals had not merely been exposed to the potentially prejudicial information but had actually formed the opinion that appellant was a former BMHI patient. The judgment of the trial court should be set aside and the case remanded for a new trial on the ground that it was a plain abuse of discretion for the trial judge to deny appellant's request to remove for cause persons from the panel who believed he had been an inmate at Bangor Mental Health Institute. I would not characterize this as a fair trial.

Leaving aside any idea of fair play, one would suppose that considerations of pure expediency would have led the prosecuting attorney in this case to join with the defense at least in asking that the questionable panel members be kept off the jury. There is a tendency for eager prosecutors to oppose, in a kind of Pavlovian response, every request that the defense makes. The prosecution, as well as the judiciary, has a responsibility to see that justice is done in criminal cases. That ideal is not well served by our decision in this case.